1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT

7          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   MICHAEL SAVETSKY, individually and )   Case No. 14-03514 SC
    on behalf of all others similarly  )
10  situated,                          )   ORDER DENYING MOTION TO
                                       )   COMPEL ARBITRATION
11           Plaintiff,                )
                                       )
12      v.                             )
                                       )
13  PRE-PAID LEGAL SERVICES, INC.      )
14  d/b/a LegalShield,                 )
                                       )
15           Defendant.                )
                                       )
16                                     )
                                       )
17                                     )
                                       )
18  _____    )

19

20  I.   **INTRODUCTION**

21       Now before the Court is Defendant LegalShield's[1] motion to

22  compel arbitration.  ECF No. 18 ("Mot.").  Plaintiff Michael

23  Savetsky opposes.  ECF No. 24 ("Opp'n").  The motion is fully

24  briefed, ECF No. 26 ("Reply"), and appropriate for resolution

25  without oral argument under Civil Local Rule 7-1(b).  For the

26  reasons set forth below, the motion is DENIED.

27  _____

[1] Defendant is actually named Pre-Paid Legal Services, Inc., but
28  does business as LegalShield.  For simplicity the Court will refer
    to Defendant as LegalShield.

*(left margin)* **United States District Court** / For the Northern District of California

**United States District Court**
For the Northern District of California

## II.   BACKGROUND

This is a putative class action alleging that LegalShield improperly charged recurring payments for pre-paid legal services without sufficient consent or disclosure.

Pre-paid legal services providers generally eschew the traditional 'fee-for-service' model of legal representation, instead selling fixed-rate memberships that entitle customers to a menu of legal services.  See generally Judith L. Maute, Pre-Paid and Group Legal Services: Thirty Years After the Storm, 70 Fordham L. Rev. 915, 916-18 (2001).  LegalShield contracts with law firms in the states where it operates and, in exchange for a monthly fee (sometimes as little as $20 per month) gives its members access to that law firm for various types of legal services.  LegalShield provides non-legal services as well, including identity theft protection, which can be purchased along with or separately from a pre-paid legal services plan.

When a prospective customer logs on to LegalShield's website, he is presented with the option to "Buy Now" or "Learn More."  If he chooses to "Buy Now," the customer is prompted to select his state and given an overview of the pre-paid legal service plans available in that state.  Alongside those options is a link to "More Plan Details."  A customer need not review those additional details to purchase the plan, however, if he does, he is informed that the details are "a general overview," and "[f]or more specific information, please view our member contract."  ECF No. 18-2 ("Pinson Decl.") at Ex. A.  The words "member contract" are a link that takes the prospective customer to a sample version of

LegalShield's member contract.   The member contract in effect when Savetsky purchased his membership contained the following clause:

> **Settlement of Disputes:** All disputes or claims relating to the Company, this Contract, any Company products or services or any claims or causes of action between you and the Company, and any of the Company's officers, directors, employees or affiliates, whether in tort or contract, shall be settled totally and finally by arbitration according to the Commercial Arbitration Rules of the American Arbitration Association . . . .   If you file a claim or counterclaim against the Company . . . in any such arbitration, you may do so only on an individual basis and not with any other member or as part of a class action . . . .

Pinson Decl. Ex. C ("Membership Contract"), at 7.   After selecting the services the customer would like to purchase and entering his personal information, the customer reaches the "Payment Information" screen.   That screen states that "I wish to pay by Credit Card until I revoke this authorization in writing," and informs the consumer that "[y]our account will be drafted each month on or about the effective date of your membership."   Pinson Decl. Ex. A at 9.   To advance to the next screen, the consumer must check a box next to the statement:

> Authorization for Electronic Premium: I, . . . authorize LegalShield, to make direct payment by charge/draft of my checking/savings/credit card account from the Financial Institution listed above.   (This authority will remain in effect until you notify us in writing to terminate the authorization.)

Id.

Savetsky purchased his membership online using the process outlined here.   After enrolling, his membership contract containing the arbitration clause cited above was mailed to the address he provided.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Subsequently, Savetsky filed this putative class action in

2    Alameda County Superior Court, seeking to represent a class of

3    those who purchased a LegalShield membership online in California

4    since December 1, 2010, and alleging that the drafting of recurring

5    payments for LegalShield membership from customer accounts violates

6    various California consumer laws.  LegalShield removed the case to

7    this Court and now seeks to compel arbitration.  Savetsky opposes.

8

9    **III.  LEGAL STANDARD**

10    Section 4 of the Federal Arbitration Act ("FAA") permits "a

11    party aggrieved by the alleged failure, neglect, or refusal of

12    another to arbitrate under a written agreement for arbitration [to]

13    petition any United States district court . . . for any order

14    directing that . . . arbitration proceed in the manner provided for

15    in [the arbitration] agreement."  9 U.S.C. § 4.  The FAA embodies a

16    policy that generally favors arbitration agreements.  Moses H. Cone

17    Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).

18    To determine whether a valid arbitration agreement exists, we

19    "apply ordinary state-law principles that govern the formation of

20    contracts."  First Options of Chicago, Inc. v. Kaplan, 514 U.S.

21    938, 944 (1995).  Here the parties agree that California law

22    governs.

23

24    **IV.  DISCUSSION**

25    This case requires the Court to resolve whether the parties

26    entered into a valid and enforceable agreement to arbitrate

27    Plaintiff's claims.  If so, the Court must then decide whether to

28    dismiss the case entirely or stay the action pending the resolution

4

**United States District Court**
For the Northern District of California

1  of arbitration.  See Sparling v. Hoffman Constr. Co., 864 F.2d 635,

2  638 (9th Cir. 1988).

3      Because arbitration is a creature of contract, the crux of

4  this motion is whether Savetsky assented to arbitrate his disputes

5  with LegalShield.  See United Steelworkers of Am. v. Warrior & Gulf

6  Nav. Co., 363 U.S. 574, 582 (1960) ("[A] party cannot be required

7  to submit to arbitration any dispute which he has not agreed so to

8  submit.").  If assent is lacking, then the Court must deny the

9  motion.  Nevertheless, even if assent is present, Savetsky argues

10 that the parties' agreement is unenforceable because it is illusory

11 and unconscionable.  Because the Court finds assent is absent, the

12 arbitration clause cannot be enforced.

13     **A.   Assent**

14     "Promises become binding when there is a meeting of the minds

15 and consideration is exchanged.  So it was at King's Bench in

16 common law England; so it was under the common law in the American

17 colonies; . . . and so it is today."  Specht v. Netscape Commc'ns

18 Corp., 150 F. Supp. 2d 585, 587 (S.D.N.Y. 2001), aff'd, 306 F.3d 17

19 (2d Cir. 2002).

20     Under California law, mutual assent is required to form a

21 contract and can be demonstrated either by words or by actions.

22 See Binder v. Aetna Life Ins. Co., 75 Cal. App. 4th 832, 850

23 (1999).  "[A]n offeree, knowing that an offer has been made to him

24 but not knowing all of its terms, may be held to have accepted, by

25 his conduct, whatever terms the offer contains."  Windsor Mills,

26 Inc. v. Collins & Aikman Corp., 25 Cal. App. 3d 987, 991 (Cal. Ct.

27 App. 1972).  In such a case, the Court must determine "whether the

28 outward manifestations of consent would lead a reasonable person to

**United States District Court**
For the Northern District of California

1  believe the offeree has assented to the agreement." <u>Knutson v.</u>
2  <u>Sirius XM Radio, Inc.</u>, 771 F.3d 559, 565 (9th Cir. 2014) (citing
3  <u>Meyer v. Benko</u>, 55 Cal. App. 3d 937, 942-43 (Cal. Ct. App. 1976)).
4  Arbitration agreements are no exception, and the "principle of
5  knowing consent applies with particular force to provisions for
6  arbitration." <u>Windsor Mills</u>, 25 Cal. App. 3d at 992.

7       While the internet has changed the factual circumstances in
8  which courts must apply these principles, the requirement of
9  "'mutual manifestation of assent, whether by written or spoken word
10  or by conduct, [remains] the touchstone of contract.'" <u>Nguyen v.</u>
11  <u>Barnes & Noble, Inc.</u>, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting
12  <u>Specht</u>, 306 F.3d at 29). Three paradigmatic contract formation
13  situations arising on the internet, "clickwrap," "shrinkwrap," and
14  "browsewrap" agreements, illustrate the application of the assent
15  requirement in similar circumstances to those at issue here. <u>See</u>
16  <u>generally</u> Mark A. Lemley, <u>Terms of Use</u>, 91 Minn. L. Rev. 459, 459-
17  60 (2006) (discussing each of these types).

18       The first, a clickwrap agreement, is familiar to most internet
19  users and requires a user or prospective customer to check a box or
20  click an "I agree" button after being presented with terms and
21  conditions (or more realistically after declining the opportunity
22  to review the often voluminous terms and conditions). <u>See</u> <u>Nguyen</u>,
23  763 F.3d at 1175-76. "Essentially, under a clickwrap arrangement,
24  potential licensees are presented with the proposed license terms
25  and forced to expressly and unambiguously manifest either assent or
26  rejection prior to being given access to the product."
27  <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 429 (2d Cir.
28  2004). Because "[b]lanket assent to a form contract is still

**United States District Court**
For the Northern District of California

assent, albeit a more attenuated form than the assent that drives
contract theory," courts generally find that clickwrap agreements
are enforceable.  Lemley, <u>Terms</u>, <u>supra</u> at 466.

Assent in the shrinkwrap context is more attenuated still,
however courts generally enforce shrinkwrap agreements as well.
Shrinkwrap agreements are common in the computer software or
hardware context, and are related to unilateral contracts in that
they involve the "'money now, terms later' approach to
sales . . . ." <u>O'Quin v. Verizon Wireless</u>, 256 F. Supp. 2d 512,
516 (M.D. La. 2003).  A classic shrinkwrap agreement generally
involves "(1) notice of a license agreement on product packaging
(i.e., the shrinkwrap), (2) presentation of the full license on
documents inside the package, and (3) prohibited access to the
product without an express indication of acceptance."
<u>Register.com</u>, 356 F.3d at 428; <u>see also</u> <u>ProCD, Inc. v. Zeidenberg</u>,
86 F.3d 1447, 1449 (7th Cir. 1996) (describing and enforcing a
shrinkwrap license for software).  Assent to a shrinkwrap agreement
is not demonstrated at the time of purchase (like in the clickwrap
context), and instead the customer's actions after receiving the
product or service demonstrates his assent.

Finally, there are "browsewrap" agreements.  "'[I]n a pure-
form browsewrap agreement, the website will contain a notice that
-- by using the services of, obtaining information from, or
initiating applications within the website -- the user is agreeing
to and is bound by the site's terms of service.'"  <u>Nguyen</u>, 763 F.3d
at 1176 (quoting <u>Fteja v. Facebook, Inc.</u>, 841 F. Supp. 2d 829, 837
(S.D.N.Y. 2012)) (quotation and internal quotation marks omitted).
As several courts have noted, assented is even more attenuated in

browsewrap agreements than in the clickwrap or shrinkwrap contexts because "user[s] can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." Be In, Inc. v. Google Inc., No. 12-cv-03373-LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013).  As a result, courts generally require users have actual or constructive knowledge of a website's terms and conditions before enforcing browsewrap agreements.  Nguyen, 763 F.3d at 1176; Van Tassell v. United Mktg. Grp., LLC, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011); Sw. Airlines Co. v. BoardFirst, LLC, No. 06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007); see also Lemley, Terms, supra at 477.

The circumstances at issue in this case do not fit neatly into any of these categories.  Instead LegalShield's presentation of its terms shares some characteristics with all three.  Nonetheless, by comparing clickwrap, shrinkwrap, and browsewrap agreements to the process by which Savetsky enrolled in LegalShield, it is clear that he did not consent to arbitrate disputes at any point.

///
///
///
///
///
///
///
///
///
///

1   When a consumer chooses the "Buy Now" option on LegalShield's

2   website and enters his state of residence, in this case,

3   California, a user next sees this:



**California Plans**                                   Not in California? Choose another state or province

| CA Legal Plan | Identity Theft Plan | Identity Theft Premium |
|---|---|---|
| $19⁹⁵ | $14⁹⁵ | $29⁹⁵ |

**Plan Details**
- Legal Advice/Consultation
- Letters/Phone Calls
- Legal Document Review
- Uncontested Divorce and Adoption Representation
- Trial Defense
- 24/7 Emergency Assistance
- + More Plan Details

**Product Discount**
Get Identity Theft at a discounted price when you buy the legal plan
☐ **Identity Theft Plan** (details) only $9.95/month
☐ **Identity Theft Premium Plan** (details) only $19.95/month

**Plan Add-Ons**
☐ **Trial Defense Supplement** (details) only $9.95/month
☐ **Home Business Supplement** (details) only $9.95/month
☐ **Home Business Supplement + GoSmallBiz** (details) only $14.95/month

BUY NOW ▸

**$19.95/month**
(+$10.00 non-refundable enrollment fee charged with the first month's membership)

Have an Independent Sales Associate contact me

**Plan Details**
- Covers Member, Spouse, and Up To 8 Dependents
- Single-Bureau Credit Monitoring
- Personal Credit Score
- Comprehensive Restoration
- Identity Consultation
- SafeGuard For Minors
- + More Plan Details

**LegalShield Legal Plan**
☐ **LegalShield Plan** additional $19.95/month Reduces Identity Theft Price to $9.95/month

**Plan Add-Ons**
☐ **Trial Defense Supplement** (details) only $9.95/month
☐ **Home Business Supplement** (details) only $9.95/month
☐ **Home Business Supplement + GoSmallBiz** (details) only $24.90/month

BUY NOW ▸

**$14.95/month**
(+$10.00 non-refundable enrollment fee charged with the first month's membership)

Have an Independent Sales Associate contact me

**Plan Details**
- Covers Member, Spouse, and Up To 8 Dependents
- Triple-Bureau Credit Monitoring
- Personal Credit Score
- Comprehensive Restoration
- Internet Monitoring
- Lost Wallet Assistance
- + More Plan Details

**LegalShield Legal Plan**
☐ **LegalShield Plan** additional $19.95/month Reduces Identity Theft Price to $19.95/month

**Plan Add-Ons**
☐ **Trial Defense Supplement** (details) only $9.95/month
☐ **Home Business Supplement** (details) only $9.95/month
☐ **Home Business Supplement + GoSmallBiz** (details) only $24.90/month

BUY NOW ▸

**$29.95/month**
(+$10.00 non-refundable enrollment fee charged with the first month's membership)

Have an Independent Sales Associate contact me

**United States District Court**
For the Northern District of California

9

**United States District Court**
For the Northern District of California

1   If the user clicks the "More Plan Details" button (circled in red

2   in the above graphic), then (and only then) will the user see this

3   screen:



25  The "More Plan Details" page continues at length, providing details

26  about the various services included in a LegalShield membership,

27  pointing out at the end that a prospective member should "consult

28  [the member] contract 'for the complete terms and conditions' of

**United States District Court**
For the Northern District of California

1  his LegalShield membership."  Mot. at 9 (quoting Pinson Decl. Ex.

2  A) (internal alterations omitted).  The words "member contract,"

3  circled in red in the above graphic, are a link to a sample version

4  of LegalShield's member contract, including the arbitration

5  provision.

6        LegalShield argues that Savetsky agreed to arbitrate his

7  claims simply by purchasing his LegalShield membership using this

8  process.  In short, LegalShield believes that the website design

9  discussed above adequately communicated the terms of the agreement

10 or, at a minimum, put Savetsky on inquiry notice of the terms, and

11 as a result, the contract is binding whether he read it or not.

12 True, "[a] party cannot avoid the terms of a contract on the ground

13 that he or she failed to read it before signing," Marin Storage &

14 Trucking, Inc. v. Benco Contracting & Eng'g, Inc., 89 Cal. App. 4th

15 1042, 1049 (Cal. Ct. App. 2001), but an exception exists "when the

16 writing does not appear to be a contract and the terms are not

17 called to the attention of the recipient.  In such a case no

18 contract is formed with respect to the undisclosed term."  Id. at

19 1049-50.  Here, there is no evidence Savetsky had actual notice of

20 the sample member contract on LegalShield's website, or

21 acknowledged the existence of such a contract prior to purchasing

22 his membership.  In fact, by simply checking the desired services

23 and clicking the "BUY NOW" button, a consumer can order a

24 LegalShield plan without even being aware a member contract exists.

25 Not to mention that a consumer would only receive actual notice if

26 he clicked through two optional links and read to page seven where,

27 under the inconspicuous heading "Settlement of Disputes," the

28 arbitration provision appears.  See Windsor Mills, 25 Cal. App. 3d

at 993 (noting that "an offeree, regardless of apparent

manifestation of his consent, is not bound by inconspicuous

contractual provisions of which he was unaware, contained in a

document whose contractual nature is not obvious.").

Furthermore, the context in which LegalShield's member

contract appears does not put users on "inquiry notice" of the

contract or its terms.  See Specht, 306 F.3d at 30-32.  The "More

Plan Details" link (which users must click to find the contract or

even to find the warning to check the contract for further terms

and conditions) appears after a list of features of the plan

(features LegalShield calls "Plan Details") including "Legal

Advice/Consultation," "Legal Document Review," or "Trial Defense."

In this context, a reasonable person could easily conclude that

"More Plan Details" are simply an even fuller list of features

LegalShield offers to its members, not the member contract or

additional terms and conditions.  Given the lack of actual notice

and the fact that "a reasonably prudent user [would not be] on

inquiry notice of the terms of the contract," Nguyen, 763 F.3d at

1177, or even the location of the contract on LegalShield's

website, the Court cannot conclude that "a reasonable person in

[Savetsky's] position would understand that he had assented to the

arbitration provision in the [LegalShield member contract] when he

purchased" his membership.  Knutson, 771 F.3d at 565.

Nor would a reasonable person in Savetsky's position

understand that by not cancelling his LegalShield membership after

receiving a copy of the membership contract he was assenting to the

arbitration provision.  True, "[a]cceptance of an offer may be

inferred from inaction in the face of a duty to act . . . and from

12

retention of the benefit offered," but here the contract did not

contain any such duty to act.  Golden Eagle Ins. Co. v. Foremost

Ins. Co., 20 Cal. App. 4th 1372, 1385-86 (Cal. Ct. App. 1993)

(citations omitted).  Instead, the membership agreement simply

provides that Savetsky may cancel his membership "at any time by

giving written notice to the Company," Pinson Decl. Ex. C.  To put

it another way, "[a] person can assent to terms even if he or she

does not actually read them, but the 'offer must nonetheless make

clear to a reasonable consumer' both that terms are being presented

and that they can be adopted through the conduct that the offeror

alleges constituted assent."  Schnabel v. Trilegiant Corp., 697

F.3d 110, 123 (2d Cir. 2012) (internal alterations omitted)

(emphasis added) (quoting Specht, 306 F.3d at 29) (applying

California law).  Here nothing in the membership contract indicated

that inaction by Savetsky would constitute assent to the terms of

the contract.  Accordingly, a reasonable consumer reading the

membership contract would have no way of knowing that failing to

cancel his membership could be construed as assent to arbitrate all

disputes with LegalShield.

     This sharply distinguishes this case from Hill v. Gateway

2000, Inc., 105 F.3d 1147, 1148 (7th Cir. 1997) and other cases

LegalShield cites enforcing shrinkwrap agreements.  See Carnival

Cruise Lines, Inc. v. Shute, 499 U.S. 585, 587 (1991) (enforcing a

forum selection clause against cruise ship passengers where the

ticket stated that "[t]he acceptance of this ticket . . . shall be

deemed to be an acceptance and agreement . . . of all [its] terms

and conditions"); Lima v. Gateway, Inc., 886 F. Supp. 2d 1170, 1178

(C.D. Cal. 2012) (noting that the subsequent document "prominently

13

states in capital letters and bold font that it applies to [the plaintiff's] purchase unless within 15 days . . . he notifies [the defendant] in writing that he does not agree to it and returns his product"); Bischoff v. DirecTV, Inc., 180 F. Supp. 2d 1097, 1011 (C.D. Cal. 2002) ("If you do not accept these terms, please notify us immediately and we will cancel your service."); O'Quin, 256 F. Supp. 2d at 517 ("According to the Terms and Conditions Pamphlet, it is the activation and use of Defendant's . . . services . . . that constitutes the acceptance of the arbitration agreement."); Sherr v. Dell, Inc., No. 05cv10097 (GBD), 2006 WL 2109436, at *2 (S.D.N.Y. July 27, 2006) ("The customer need only return the product according to the return policy in order to reject the Agreement."). Unlike these cases, the membership agreement Savetsky received provided no indication whatsoever that legal consequences (like assent to the arbitration provision) would flow from his failure to cancel the contract.

Because the "outward manifestations of consent" present in this case would not lead "a reasonable person to believe [Savetsky] has consented to the agreement," the Court finds there was no valid and enforceable agreement to arbitrate. Knutson, 771 F.3d at 565.

///
///
///
///
///
///
///
///

United States District Court
For the Northern District of California

**V.** <u>**CONCLUSION**</u>

Because there was no valid and enforceable agreement to arbitrate, there is no basis to compel arbitration. Accordingly, LegalShield's motion is DENIED.

IT IS SO ORDERED.

Dated: February 12, 2014



UNITED STATES DISTRICT JUDGE